MARK J. RICE (SBN 124934)
McNEIL, SILVEIRA, RICE & WILEY
55 Professional Center Parkway, Suite A
San Rafael, CA 94903
Telephone: (415) 472-3434
Facsimile:  (415) 472-1298

Attorneys for Defendants HERBERT M. GOTTLIEB
and SWIDENT, LLC, a California Limited Liability Company

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NACIO SYSTEMS, INC., a Nevada Corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>HERBERT M. GOTTLIEB, an individual; SWIDENT, LLC, a California Limited Liability Company,<br><br>    Defendant. | Case No.  C O7 3481 PJH<br><br>DECLARATION OF HERBERT M. GOTTLIEB IN OPPOSITION TO TEMPORARY RESTRAINING ORDER (WITHOUT PRIOR NOTICE) TO PRESERVE EVIDENCE AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION<br><br>Date: August 1, 2007<br>Time: 9:00 a.m.<br>Crtrm: 3, 17th Floor |

I, HERBERT M. GOTTLIEB, declare:

1. I am named as defendant in the above-entitled action and am CEO of Swident, a California Limited Liability Company. Except as otherwise noted, I state the following from personal knowledge and could and would testify competently thereto if so required.

2. I am a Judgment Creditor of Nacio Systems, Inc., a Nevada Corporation following a binding arbitration with Nacio, Inc. under the binding arbitration clause of my employment agreement with Nacio, Inc. The judgment is for $240,811.60. The new action is a

1
DECLARATION OF HERBERT M. GOTTLIEB IN OPPOSITION TO TEMPORARY RESTRAINING ORDER (WITHOUT PRIOR NOTICE) TO PRESERVE EVIDENCE AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

form of further retaliation and frivolous "indirect appeal' of the judgment I have against Nacio, following a bank levy against Nacio towards payment of the judgment. The arbitration took place before the American Arbitration Association before Arbitrator John Nagle. A true and correct copy of the Judgment Upon Order Confirming the Arbitration Award Against Nacio Systems, Inc. filed April 18, 2007 and underlying order confirming Petitioner's contractual arbitration award against Nacio Systems, Inc. are attached and marked Exhibit "1" and made a part hereof by this reference. Attached therein is a true and correct copy of the Final Decision of the Arbitrator, John Kagel, December 13, 2006 along with Arbitrator Kagel's Partial Final Opinion and Decision dated November 6, 2006 which formed a part of the Arbitration Award and underlying Judgment.

3. Attached marked Exhibit "2" is a true and correct copy of the Abstract of Judgment received in Marin County reflecting that the total amount of the Judgment was $240,811.60.

4. The Judgment comprises a number of matters where Nacio breached agreements with me, including non-payment of wages, Labor Code Section 203 "waiting time penalties," default on a promissory note to me from Nacio, Inc.'s predecessor, Interactive Holding Corporation (which Nacio folded into its operations), secured by Attest assets including GASP Software, codes and copyright. Specifically, as set forth in the final arbitration decision at page 3, of Exhibit "B" attached to Exhibit "1" hereto, the following are the amounts awarded to me as of that time:

  (1) AAA Fees (as stated below)...............$7,025.00
  (2) Traditional Court Costs..................... 1,483.20
  (3) Other Expenses............................      47.30
  (4) Attorney's Fees.............................. 7,869.96
  (5) Interest (to partial final decision date)...14,044.43
  (6) Principal....................................<u>208,788.72</u>
  (7) Total.........................................$239,258.61

5. The partial final decision attached as Exhibit "B" to Exhibit "1" hereto identifies

LAW OFFICES OF
MCNEIL, SILVEIRA, RICE & WILEY
AN ASSOCIATION INCLUDING PROFESSIONAL CORPORATIONS

and itemizes how the principal and interest was arrived at in terms of the various breached of covenant by Nacio towards me awarded against Nacio and later made part of the Judgment against Nacio.

(1) Unpaid and due commissions as of March 31, 2006......................... $25,012.94
(2) Waiting time penalties under Labor Code Section 203................. 7,500.00
(3) Severance payments due to constructive termination clause........ 90,000.00
(4) Defaulted Promissory Note.............81,206.03 plus interest from May 20, 2006
(5) Stock bonus amount..................... 5,067.75

6. While Nacio did not contest that arbitration award, it has subsequently attempted to undermine or "counter" that award by successive lawsuits against me that I consider being utterly without merit and which attempt to set up an "offset" defense to the unpaid Judgment. The current lawsuit is another example of that improper and frivolous tactic by Nacio.

7. I have complied with the TRO and do not oppose it. It asks for preservation of any GASP related computer stored data. My possession of any remnants of that GASP information is old, not used by me, and was not taken at the time of my departure but has existed (if it exists) on my old computer hard drive for a long period of time on my desktop computer, before ever leaving Nacio as an employee and becoming a consultant. I have not used that GASP data, and have not personally used that hard drive or that computer where any remnant GASP data may be stored for many months. So it is clear, by Agreement with Mr. Goldenberg, I was permitted to take to my home office, my desktop computer and various other pieces of equipment when moving from employee to consulting status with Nacio, software, supplies, etc., as they were still important to my consulting work for Nacio. Mr. Goldenberg agreed that I could keep those physical items in perpetuity, and "no wipe" was requested or done by Nacio. I have no technical skill to do a wipe. So, vestiges of old GASP data I presume remain on my old desktop that Mr. Goldenberg permitted me to keep.

8. Attached, marked Exhibit "3" hereto is my Separation Agreement dated 2/21/06 with Nacio (which Nacio and Mr. Goldenberg breached) listing the desktop computer among

LAW OFFICES
OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

the assets I could take home with me, as I was continuing to consult with Nacio from my home office; also by agreement with Mr. Goldenberg:

> "3. I retain possession of the following equipment: <u>Dell Dimension 8200 Pentium 4</u>, 2 monitors, keyboard, Kensington mouse, speakers and other peripherals currently used by me, HP 4550N Color LaserJet Printer, HP4050TN Printer, <u>Sentry Safe</u>, Danby Refrigerator and Net Gear hub."

A true and correct copy of the Employment Agreement is attached, marked Exhibit "4" and made a part hereof by this reference. My opposition is to the entire lawsuit. As to the court's TRO and OSC re: preservation of GASP data, I do not oppose that TRO. I do oppose the alternative and broad form of TRO, which seeks to shut down my business, as without merit, would be deeply invasive of my new business, an undue hardship, and risk disclosure of my business plans, attorney-client information, and personal information.

   9. If the GASP registrations key program exists on my old desktop's hard drive, and I am not sure that it does, it has not been accessed upon and it existed from long before I moved from employment at Nacio to consulting from home for Nacio last April 2006. Its existence if any, in the computer's storage would therefore be in the ordinary course of business using that desktop while it was at my office at Nacio, and not wiped when I moved from office employment status to home office consulting for Nacio..

   10. The "SID" I do not believe is on the computer, but since the TRO, I have not checked for same. If the SID exists, it would also be unaccessed and its existence would be years old and pre-date my shift from employment to consultancy for Nacio last April 2007. Its existence if any would be in the ordinary course of business using that desktop while it was at my office at Nacio, and not wiped when I moved from office employment status to home office consulting for Nacio.

   11. By agreement with Nacio, Mr. Goldenberg, I left Nacio with my office computer. I still needed it to perform sales calls, marketing and consulting for Nacio. That is, my desktop computer by agreement moved from the Nacio office to my home office. I do not use that desktop computer anymore and have not for some time, though have had others without my access use unused space for business functions, and without access to any of the subject material if it exists at all, under my access.

12. When I left Nacio as an employee and became a consultant, things were amicable between Nacio and me and Mr. Goldenberg and me. Mr. Goldenberg had in writing agreed to pay commissions still due to me when Nacio then received, and for Nacio he hired me as a consultant to Nacio to work from home on designated projects. A copy of our departure agreement is attached hereto as Exhibit 3, and the consultancy agreement, Exhibit 5. I agreed that if Nacio complied with those terms and kept its promise of payment of the commission income that my family needed as living wages, I would not seek the $90,000 in severance due me from Nacio for constructive termination, due to Mr. Goldenberg's terminating my staff and resources over a period of time, that left the Attest division of Nacio a fairly empty shell and unable to support GASP, and me without support to perform my duties as Attest's President.

13. When later, Mr. Goldenberg breached the employment and separation agreements with me; I demanded payment of my earned wages. When that was unsuccessful I filed AAA arbitration and was successful in establishing Nacio's substantial debt to me. Then Nacio defaulted on its promissory note to me as well.

14. Mr. Goldenberg knew that, because he had permitted me by express agreement to take my desktop computer from work with me to work from at home, that any software remnants related to Attest would remain on the existing stored data, whether that data was accessed or not. I now suspect that what I saw as a kind gesture on Mr. Goldenberg's part, to make my move to a home office smooth for me and efficient for my consulting for Nacio, was a "set up" by him to try to pull this very stunt, of claiming my possession of data on the desktop, from GASP (even if unexecuted or unaccessed after my departure) meant" I took it." I did not. Any GASP data was with the computer when I left. If Mr. Goldenberg did not want that data there, then he needed to arrange for its wipe before turning it over. He did not even think about this issue. I remained a consultant for Nacio.

15. Also, Mikol Westling is incorrect that I did not hand him the contents of my personal safe before I took the safe. I did hand Mr. Westling the source code disk. Perhaps he will now remember. The safe was empty when I was permitted, again by express agreement, to take the safe home as my personal property.

LAW OFFICES
OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

16. Attached as part of Exhibit 3 is a true and correct copy of the list of items Mr. Goldenberg agreed I could take. They list the desktop computer and the safe. They also list a printer. I took the printer, and with it, the printer stand and paper shredder, which I believe was included. After I filed the AAA arbitration, Mr. Goldenberg got angry and began to threaten me, and stopped paying on the promissory note as well. I was still a consultant to Nacio. He has threatened to retaliate repeatedly for my seeking payment of my wages.

17. I also categorically <u>deny</u> that with PS'Soft or with BIT, or with my own business, such as wiping GASP data if a concern, that have taken any unfair competitive advantage of Nacio. I promoted GASP as a consultant to PS'Soft. My own service is complimentary to software installation screening software such as GASP, such that I benefit people who buy GASP or comparable screening software. My service is a trouble shooting service that is primarily manual, and fills a "gap" that products like GASP do not fill. I have acted fairly and have not misappropriated nor contacted the current customers of Nacio. I have targeted for my business, any business that might need or currently use screening software in large volumes, as likely candidates for using my additive, primarily manual trouble shooting service.

18. The Court may benefit in its understanding of the facts if I explain the underlying circumstances of my $240,000 judgment against Nacio which has led to this unfounded retaliation by Nacio. This background will assist the court in recognizing the punitive and retaliatory nature of this successive action. The following determinations by the arbitrator are now part of the Judgment, and as I understand, are binding findings upon Nacio. At page 3 of the Award, the Arbitrator defining the basis to find constructive determination stated, that they agreed with me that Nacio had deliberately stripped the Attest division which I ran, of personnel and resources and thus prevented me from performing my work. This in turn made it very difficult to market the Attest software products, i.e. GASP. Nacio now claims that this was not self-inflicted conduct that prevented Attest from realizing GASP's potential, and now claims that I was responsible for sales difficulties in GASP. This is simply untrue. Nacio, as the arbitrator determined, stripped the Attest division of most resources and assets, as has been adjudicated by arbitrator Kagel,

LAW OFFICES
OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

"... the claimant raised issues concerning elimination of staff working at his direction in the Attest division headed by him that respondent (Nacio) had acquired. . . .(Cl. Ex F.Tr 51, 102ff). Personnel were hired and terminated without input from claimant. (Tr. Cal 124) of employees who had exclusively reported claimant (Herb Gottlieb) were given dual responsibility (Pr Tr.2) He (Gottlieb) was therefore required to do tasks that took him away from his primary role."

19. Mr. Murray Goldenberg was the defacto President and Chief, Executive Officer of Nacio, Inc. When he ordered Nacio staff to not pay my commissions, I filed my AAA Arbitration Demand. My employment agreement with Nacio calls for binding arbitration. A copy of that agreement is attached as Exhibit "4" hereto. In further retaliation, Mr. Goldenberg then caused Nacio to stop paying me on the unpaid Promissory Note which was secured by all of the assets of the Attest division of Nacio Systems, Inc. including all the subject assets which Nacio now claims I misappropriated.

20. A true and correct copy of the underlying Promissory Note dated December 1, 2004 in the amount of $125,000 and executed by Mr. Goldenberg in my favor, along with the recorded UCC-1 Financing Statement is attached hereto as Exhibit "6" and made a part hereof by this reference. The note, the employment agreement, and transfer of assets were part of a series of transactions between me and Interactive, now known as Nacio. As the CEO and majority shareholder of Attest, including Attest's IT assets including copyrights and codes relating to GASP, I and other shareholders agreed to transfer those assets to the Interactive Holding Group, Inc. an entity that was ultimately folded into Nacio Systems, Inc., the plaintiff herein. I took and kept a collateral pledge security interest in those IT assets against the note. Under the Promissory Note, Exhibit "5", it provides specifically that "this note shall be collateralized with the [sic] all of the assets of the Attest Systems Division of the maker. Maker herby irrevocably authorizes a filing of a UCC 1 with the appropriate agencies evidencing this note." These assets were pledged to me in case of default. The note is in default, as held by binding arbitration award.

21. In terms of the intellectual property assets of Attest, these were originally my creation within Attest and were transferred to Nacio by me subject to collateral pledge back to me for security on the note. Hence, the original copyrights and data for GASP, originated with me, and when transferred, Mr. Goldenberg knew and expected that I would have those items in

7
DECLARATION OF HERBERT M. GOTTLIEB IN OPPOSITION TO TEMPORARY RESTRAINING ORDER (WITHOUT PRIOR NOTICE) TO PRESERVE EVIDENCE AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

my safe and on my desktop computer at Nacio, as part of my duties. It would be appropriate under the collateral pledge to have such access in case of default in the note. These were therefore, preexisting data bases of Attest IT assets of which I had possession, custody or control, as well as data bases that later, at Interactive Holdings Corporation Nacio, Inc., to which I had access as President of the Attest Division (and later as a consultant to Nacio by written agreement).

22. Since these assets were pledged to me on account of the agreed collateral and promissory note, it is untrue, as Nacio claims, that I have no ownership interest therein or that any possession of the security assets would be improper. In effect, I transferred those intellectual assets, subject to a collateral pledge, back to me under a Note that Nacio since has defaulted on.

23. When my desk top computer was transferred back to me at the time of my shift from an employee of Nacio to consultant in April 2007, it was not required of me, nor did I posses the skills to "wipe" all Nacio" assets from my computer at that time. Also, I had not "wiped" my data in 2002 when the Attest assets were transferred to Nacio, but treated my possession as a secure backup and in light of my recorded security interest in case of note default. So, it would not be unusual or improper if some unexecuted GASP software files remained on the desktop, and remain unexecuted and unaccessed for years. I came into the possession of the data lawfully, as an IT transferor and secured party, and then again as President of the Attest Division at Nacio, all long before my shift from employment to consultancy last March 2006. Those GASP software stored data on the desktop, were not shifted to the desktop at time of my shift to consultancy, as Nacio alleged, but pre-existed and were present for legitimate reasons when then placed.

24. Because the Promissory Note was defaulted and is collateralized by the assets of the Attest Division of Nacio I continued to have a security interest in those pledged assets.

25. A list of the physical tangible and intangible assets that were transferred are to Nacio and for which I retained a collateral pledge agreement and UUC 1 security interest on the promissory note are listed as marked on Exhibit "6" hereto. Amongst those tangible assets which are therein listed are the following tangible assets:

(1) Sales Force database of customers, leads, etc. GASP source code.

8
DECLARATION OF HERBERT M. GOTTLIEB IN OPPOSITION TO TEMPORARY RESTRAINING ORDER (WITHOUT PRIOR NOTICE) TO PRESERVE EVIDENCE AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

(2)   GASP trademark.

(3)   GASP copyrights.

(4)   Attest website.

(5)   Various computer and office equipment.

26.   As part of the initial transfer, due to my continued working at the Attest Division at Nacio first as employee then as consultant, I was not required to "purge" or wipe my existing databases of any of the collateral pledge and tangible assets which continue to be used in the ordinary course of business at Attest Systems and which were properly used by me as an Attest Employee and/or consultant. That could have been done if requested, but it was not. What Mr. Goldenberg wanted to know was that the safe contents remained at Nacio, which they did.

27.   The undersigned believes that it is important to present some of the background regarding the tangible assets in their genesis in the collateral pledge of those assets to me upon default of a now defaulted and judicially determined default of promissory note so that it is clear that the within action is an improper abuse of process and an effort at an indirect "appeal" of a $240,000 judgment in my favor due to material breaches of my employment agreement with Nacio, Labor Code violations and a defaulted promissory note which had as its collateral a pledged security the assets which were initially transferred to Nacio and which included the GASP copyrights, trademarks and codes. Contrary to the arguments of plaintiff Nacio, I did <u>not</u> use take the GASP "SID" database with me when I removed my safe which was part of my property, and agreed list of items that I was permitted to take. I emptied the safe and provided the source code contents in the safe to Mikol Westling. Mr. Westling's declaration is incorrect on this point. Obviously, Nacio would not wait fifteen months to recover these secure items and could not have done business without then. Nacio has the data they claim I took with the safe.

28.   I did not receive a signed Order from the plaintiff when I was served on July 19, 2007 with a Complaint and the unsigned proposed application for temporary restraining order(s), without the court's interlineations or file stamp, and a cover letter from counsel (Exhibit 7) stating I could not use my computers at all. What I received were two alternative versions of the unsigned proposed temporary restraining orders. The Plaintiff's attorney's

9
DECLARATION OF HERBERT M. GOTTLIEB IN OPPOSITION TO TEMPORARY RESTRAINING ORDER (<u>WITHOUT PRIOR NOTICE</u>) TO PRESERVE EVIDENCE AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LAW OFFICES OF MCNEIL, SILVEIRA, RICE & WILEY  
AN ASSOCIATION INCLUDING PROFESSIONAL CORPORATIONS

cover letter made reference to an order but did not include one. It was only until after hours on the evening of July 19, 2007 that I was able to meet with my legal counsel, Mark J. Rice and he downloaded from the court website the actual signed order which reflects a far narrower order that I preserve and leave intact, preserve and not attempt to destroy or alter any documents relating to GASP software that might be on my hard drives or any other computer information not seeking through an ISP provider to alter or eliminate any of that GASP information. This was different and narrower than I was led to believe from counsel's letter (Exhibit "7") which I felt to be misleading. I am able and willing to comply with that TRO and have done so, though I believe that this entire action is a demonstrable farce and pure retribution for my collection efforts on my judgment against Nacio.

29.  I note that the GASP software, which may remain on my old desktop, would largely be remnants of things accumulated during or before my employment with Nacio that either predated my employment with Nacio or were part of the collateral pledge and which have been on a desktop on a computer I have not personally used for some time. As far as I know, I do not have the registration key program and that allegation is false. As far as I know, I do not have the "SID" database and that allegation is false. If those data items do exist on my old desktop storage, it's as a vestige and remnant and not executed or accessed by me since I left the employ of the Attest System division.

30.  The following background is important for the court to understand the context in which this current surprising and frivolous lawsuit is brought against me following my successful arbitration and judgment against Nacio for $240,000 for a variety of material breaches of agreements with me that include a collateral pledge of the very assets involved herein as security interest in case of default.

31.  Although the TRO and orders for cause relate to GASP offer only, I would like to address briefly the concept of my troubleshooting services at Swident as well as the allegations relating to PS'Soft and BIT which are unfounded.

32.  Specifically, Swident, the LLC that I own, created through my authorship, a technical service that allows "troubleshooting" in a partly manual, partly automated fashion, in order "audit" screening programs such as GASP and its competitors to double check to see the tally of software licenses against operating software programs match. If they do not match, it

LAW OFFICES OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

becomes possible that the business has unlicensed software on its servers, and could face civil action or penalties from the software vendors. Large companies who have thousands of operating computer terminals cannot manually or easily keep track of their software license inventory. GASP, which I was responsible for creating while I owned Attest, is like other similar programs in that it runs through a computer server like a virus scanner, and identifies software against which the license tally can be checked. However, while valuable as software, GASP and competing products to GASP have not been "fail safe," or perfect in the automated audit function. As a result, in cases of doubt, or where a licensor is making a piracy claim, some manual license verification is needed. These application installation screening programs, such as GASP, have a gap. The service I provide fills that gap. It is additive to a GASP type product, in that, a company generally needs to have a GASP or other application screening software program in the first instances, to need my service.

33. My service or manual trouble shooting is a valuable service towards large, institutional type clients such as banks or other large entities who have many computer users and many computer hard drives and can easily end up having more computer stations than licenses and find themselves being in a position subject to claims of unlicensed software use. What "GASP" does, as do other products similar to GASP such as Altiris, Centennial, or Microsoft SMS is to download into a computer system served by a server and determine the number of software programs running across the system against an automated basis. From that data the client or company can then determine if it has the proper number of licenses. It is basically a software license audit program for internal audits to make sure the right number of licenses is secured to avoid violation of license agreements with third party software vendors. GASP, and competing products to GASP, operate in an automated fashion not unlike a virus scanner which produces a print out or read a tally of infected files, except in the case of GASP, it identifies installed software which does not have a license or a discrepancy between the number of licenses and number of software users of a particular software program.

34. My product at Swident does not compete with GASP. Rather, it is an additive, or compliment to the sorts of automated software license screening functions performed by GASP and competing products. Namely, none of the automated programs are 100% accurate or complete. When there is a challenge by a software vendor as to the adequacy of licensing,

LAW OFFICES
OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

the third party might disagree with the tally of licenses against software use automatically produced by a GASP-type software. At that point, a more manual "double check" is necessary to again use the analogy of the software virus capture, software, when "bugs" still exist, a computer owner will typically call in a technician to run programs manually to clean the computer. In somewhat analogous fashion, what Swident's product does is run a manual program to double check and add to the results in a more intensified fashion against the automated results of the GASP type software. It is basically a partly manual, partly automated "second opinion" type software that helps a user verify and confirm whether or not the automated results depicted by GASP or competitor of GASP in its software is correct or not. Often what happens is that the Swident product will pick up additional, unlicensed items.

35.  In this regard, what Swident does is fill in the "gap" not yet served by the status GASP-type technology exists in the marketplace. GASP-type software is one level of product of automated license screening, but it does and always captures all software in use or licenses. Swident does different service, more like an out source service technology tune up or diagnostic, than a running automated program. My service operates on, different algorithms and it's copyrightable by me and not part of the GASP software suite of copyrights, at all.

36.  While it was at Attest, it was my obligation to back up the CRM database regularly for security. Because I was leaving, I needed to be sure that I could confirm that the data was backed up before I left the Nacio office, which I had not yet done. I sought to avoid any later charge that it had not been backed up; that backup I did around March 26, 2006, prior to the shift from employment to consultancy status. As part of that regular backup, I did <u>not</u> transfer to my home computer the software, as now claimed by Nacio. I did not, nor now, consider that backup activity as part of my job duties to be misappropriation or improper. The email confirmation did not transfer data to me. As a matter of clarification, had I wanted to acquire that data there would be no reason to send it to my home computer as I already knew that my business desktop computer at Nacio would come with me when I left. My office email address was in the process of being removed, and I needed a confirmation verification of backup, for which I would usually use my office email.

37.  I also disagree completely with and dispute the claims over my consultancy with PS'Soft. PS'Soft is not a competitor of Nacio or GASP. Rather, PS'Soft has different products

LAW OFFICES
OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

which serve to compliment only companies using the Microsoft SMS software. The contact at PS'Soft, Daryl Frahm, expressed frustration to me with Murray Goldenberg in terms of Murray Goldenberg's willingness to meet at PS'Soft schedules. I also learned later, in the course of investigating the last retaliatory lawsuit that Nacio filed against me, that Mr. Frahm had done a background check on Mr. Goldenberg and learned, among other things, over his cease and desist order at the Securities and Exchange Commission, a copy of which is attached hereto as Exhibit "8" and made a part hereof by this reference.

38.  Contrary to Nacio's claim, I advocated to PS'Soft and Mr. Frahm use of the GASP products, and I believe that had it not been for Mr. Goldenberg's involvement in the company and his unresponsive approach to efforts by Mr. Frahm to meet further with him that this may well have been successful. Contrary to the defendant/plaintiff's allegations, I did <u>not</u> dissuade PS'Soft from working with Nacio, but encouraged it.

39.  I also have no knowledge about the claim that BIT was contacted by me. BIT never "lifted off". As far as I know there were <u>never</u> any sales into South America of GASP products. Mr. Goldenberg in our arbitration specifically testified that he was somewhat reluctant to advance the GASP product further because he believes it needs to be "refreshed". Pertinent copies of that arbitration proceeding and transcript are attached and marked Exhibit "8" and made apart hereof by this reference.

40.  To claim that I was somehow involved in causing no sales by BIT is untrue. It is also untrue for Nacio to claim that there were BIT sales in South America and they simply dropped off. There never were any South American sales, as far as I saw.

41.  I also disagree with Ms. Berkart and Mr. Westling's declarations. I did not at any time stalk Ms. Berkart or follow her. I was upset when Mr. Goldenberg did not pay my due wages, and I may have expressed upset at that to him, but that was understandable, Mr. Goldenberg was intentionally seeking to deprive me of wages due me, that he promised me expressly, and were part of my employment agreement, and which I needed to feed and house my family after transition from employment to consultancy. I also disagree with Ms. Berkart's statements to the effect I had spreadsheets templated like the SID, or had her do anything that would conflict with her duties at Nacio. I did <u>not</u>, as she alleges, tell her I would get in trouble,

LAW OFFICES
OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

or say the things she said I did. She did visit my home office, and as I am a computer consultant, I had more than one operating computer both for myself and my family.

42. Attached marked Exhibit "9" is a true and correct copy of the first of these "indirect appeals and frivolous lawsuits" filed against me by Nacio in Marin Superior Court. That suit was served just a couple of days prior to the hearing on February 18, 2007 on my petition to confirm the arbitration award. It was my belief then, and now, that these repetitive, false and frivolous lawsuits against me are an effort by Nacio to overcome the arbitration award and judgment by essentially malicious actions and abuses of process. This is how Nacio intends to negotiate with me.

43. Subsequent to that first lawsuit, which alleges similar things, I met with Carey Daly at his invitation. We met at the Wild Fox restaurant in Novato, California on or around the last week of April 2007. At the time, Mr. Daly introduced himself to me as a person who was coming into Nacio along with other potential investors to salvage Nacio. Mr. Daly expressed displeasure at how Mr. Goldenberg had managed the company. He made each of the following to me at our face-to-face meeting which was largely driven by his desire to settle and pay off in acceptable fashion, the large judgment in my favor against Nacio.

44. At the meeting, Mr. Daly talked specifically about resolving the issue. He offered and began to describe a deal that he was putting in place.

45. At the meeting, Mr. Daly told me that that he was willing to arrange for a significant amount of cash as upfront payment to me towards satisfaction of my $240,000 judgment and arbitration award against Nacio. He also then told me that he wanted me to consider receipt of the balance of the judgment in stock, and that Nacio was going to be acquired by a NASDAQ traded company. Mr. Daly indicated that because of securities and exchange rules, he could not tell me who the ultimate acquirer of Nacio was at that time. However, he indicated that as a gesture of good faith, he would share with me his own personal CV or bio and would share with me the names of the "deal makers" arranging the transaction, and would provide to me express warranties regarding this "new company" in terms of its size and operating history.

46. At that meeting in late April 2007, I also mentioned to Mr. Daly the fact that this earlier Marin County lawsuit that had been filed was improper and frivolously, and should be

LAW OFFICES OF
MCNEIL, SILVEIRA, RICE & WILEY
AN ASSOCIATION INCLUDING PROFESSIONAL CORPORATIONS

dismissed. Mr. Daly expressly agreed. He stated to me that the lawsuit in his view was bogus, without merit and indicated that he would cause its dismissal.

47. I then followed up with an email dated May 1, 2007 with Mr. Daly and he emailed me back, copies of which are attached as Exhibit "10" and made a part of by this reference, I asked that this action be dismissed. (Mr. Daly then emailed me back, at Exhibit 10.) The action thereafter was dismissed. A copy of the Dismissal is attached and marked as Exhibit "11" and made a part hereof by this reference.

48. As outlined above, the facts of this situation are no where close to what is being presented by Nacio. I did not sign any of the unsigned agreements attached to their declarations and they were not ever presented to me. My obligations are within my employment agreement, consulting agreement and the collateral pledge of assets described above, as part of the promissory note. I believe that on one hard drive on the desktop computer I no longer use, there may be remnants of GASP type software that has not been used nor executed, either at all or since my departure from Nacio. That is the desktop that I had at Nacio, and that Mr. Goldenberg agreed I should take to my home office after the shift from employment at Nacio's office to home office consulting. However I do not and did not have the source code or the SID or registration key program as alleged – at least I do not believe so, and in light of the TRO, have not tried to open up the hard drive to determine if those codes exist.

49. I have upon receipt of the temporary restraining order complied therewith. I and have not made effort to examine what might be in that older data base that has not been used, Though the temporary restraining order and order to show cause has not addressed any other issues in this case, I would be opposed to any more invasive efforts by Nacio which I consider to be malicious harassment motivated by their effort to undermine my own business at all costs, in that retaliation, retribution for my judgment, the judgment in my favor and the fact that it has not been paid.

50. My computer contains sensitive attorney/client information, relating to my judgment and action against Nacio, as well as personal and private matters, my business plans and the like. These lawsuits appear to be efforts by Nacio to nullify that judgment and drive me

15
DECLARATION OF HERBERT M. GOTTLIEB IN OPPOSITION TO TEMPORARY RESTRAINING ORDER (WITHOUT PRIOR NOTICE) TO PRESERVE EVIDENCE AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LAW OFFICES
OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS

out of business in an anti-competitive way. I've specific evidence of that which I now share with the court.

51. Approximately three weeks ago, I was working for a client who was conducting an important software audit with very limited time to complete. In order to complete the audit the client needed to acquire 200 more GASP software licenses – i.e., purchase them from Nacio. I contacted Nacio to arrange for that purchase of Nacio license. Once Nacio understood that I was the consultant to this client, Nacio refused to sell to that client. As I did not have the source code for the registration key to help, nor would have shared it if I had, therefore the client was not able continue the audit until Nacio finally after significant effort and assurances by the client agreed to sell those additional GASP license to the client. This placed additional stress on the client who was attempting to complete the audit in a very short time frame. This was Nacio's continued effort to damage my business, also for exercise of my right to collect a judgment for wages and unpaid promissory note, which itself is secured by the very GASP assets at issue.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 25th day of July 2007 at San Rafael, California.

*[signature]*

_____
HERBERT M. GOTTLIEB

16
DECLARATION OF HERBERT M. GOTTLIEB IN OPPOSITION TO TEMPORARY RESTRAINING ORDER (WITHOUT PRIOR NOTICE) TO PRESERVE EVIDENCE AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

LAW OFFICES OF
MCNEIL, SILVEIRA,
RICE & WILEY
AN ASSOCIATION INCLUDING
PROFESSIONAL CORPORATIONS