EXHIBIT 8

```
 1                AMERICAN ARBITRATION ASSOCIATION
 2
 3   HERBERT M. GOTTLIEB,        )
                                 )
 4            Claimant,          )
     vs.                         )
 5                               )
     NACIO SYSTEMS, INC.,        )
 6   formerly INTERACTIVE        )
     HOLDINGS GROUP, INC.,       )           CERTIFIED COPY
 7                               )
              Respondent.        )
 8                               )
                                 )
 9   _____
10
11                        ---oOo---
12                 TRANSCRIPT OF PROCEEDINGS
13                        ---oOo---
14                     October 16, 2006
15
16
17             Taken at the location of:
             American Arbitration Association
18            One Sansome Street, 16th Floor
                San Francisco, California
19
                          ---oOo---
20
21   Reported by
     JOAN T. GRIER, CSR #8958
22
23                   M. P. RADOCY, INC.
                CERTIFIED SHORTHAND REPORTERS
24                   737 Channing Avenue
                 PALO ALTO, CALIFORNIA  94301
25       TELEPHONE (650) 325-4393   FAX (650) 325-4394

                                                              1

            M.P. RADOCY, INC.        (650) 325-4393
```

```
 1                    A P P E A R A N C E S
 2
 3    ARBITRATOR:   JOHN KAGEL, ESQUIRE
 4                  P.O. Box 50787
 5                  Palo Alto, California 94303
 6
 7    For Claimant:
 8            McNEIL, SILVEIRA, RICE & WILEY
 9            55 Professional Center Parkway, Suite A
10            San Rafael, California  94903
11            (415) 472-3434
12            By:  Mark J. Rice, Attorney at Law
13
14    For Respondent:
15            DONAHUE, GALLAGHER, WOODS
16            300 Lakeside Drive, Suite 1900
17            Oakland, CA 94612
18            (510) 451-0544
19            By:  William H. Green, Attorney at Law
20
21
22    ALSO PRESENT:  Herbert M. Gottlieb
23                   Murray Goldenberg
24
25
                                                              2
```

```
 1  respondent?
 2          MR. GREEN:  No.  Maybe we can take a two-minute
 3  break and let me talk to Mr. Rice about something.
 4          THE ARBITRATOR:  Go ahead.
 5          Off the record.
 6          (Recess taken from 10:29 to 11:12 a.m.)
 7          THE ARBITRATOR:  Call your witness, Mr. Rice.
 8          (Discussion off the record.)
 9          MR. RICE:  I'm going to call Mr. Goldenberg
10  first.
11          THE ARBITRATOR:  Mr. Goldenberg, would you come
12  forward, please, and have a seat.
13          Do you wish the witnesses sworn?
14          MR. RICE:  Yes, please.
15          (Witness sworn.)
16                  MURRAY GOLDENBERG,
17     Called as an adverse witness by the Claimant,
18                  testified as follows:
19          THE ARBITRATOR:  Your name, sir.
20          THE WITNESS:  Murray Goldenberg.
21          THE ARBITRATOR:  Mr. Rice, I assume you're
22  calling Mr. Goldenberg as an adverse witness.
23          MR. RICE:  I am calling him as an adverse
24  witnesses.
25          THE ARBITRATOR:  Mr. Goldenberg, you've been
```

12

1        MR. RICE: Q. How many -- at the time of
2   Mr. Gottlieb's departure, what were the total number of
3   employees within Nacio?
4        A.   Within Nacio?
5        Q.   Yes.
6        A.   Excluding our after-hours staff, probably 25.
7        Q.   Okay. Can you turn your attention to Exhibit F
8   again. And we're almost concluded. Where Mr. -- and I
9   know you indicated you weren't sure whether you received
10  this or not, but let me see if I can refresh your
11  recollection.
12            He writes:
13            "In light of the renewal I am also
14            concerned about the reduction of staff
15            under me, and whether you plan to
16            increase or change the duties of my
17            position. Duty changes require my
18            approval under the employment contract.
19            I need to know if any are planned.
20            Could you please discuss with me your
21            plans for my duties."
22            Do you have a recollection now of having heard
23  that you did receive this e-mail?
24       A.   No, I don't have a recollection of receiving
25  this e-mail, but I do recollect Herb and I having a

73

1  discussion, and I made it very clear to him that his
2  duties were unchanged; that he joined principally to
3  generate sales for that division.
4      We were unable to generate sales to anybody's
5  satisfaction because the software was old and worn, and
6  it had to be refreshed.  And Herb worked with one of our
7  other folks to make a lot of good changes and put a lot
8  of good things in place.
9      And it was our intention to have him continue
10 generating sales and doing exactly that without the
11 responsibilities of worrying about accounting and so on,
12 which is what I agreed I would look after.
13     Q.  But Herb did complain that he felt that he was
14 being undersupported and undermined by your resource
15 changes?
16     A.  He didn't complain about that specifically.  We
17 had discussions from time to time about where we were
18 going and what we wanted to do with Attest, but he never
19 complained that he was being undermined.
20     Q.  On Friday when we had discussions, you
21 complained that Mr. Gottlieb had engaged in some behavior
22 you thought was improper.  Do you recall that?
23     A.  Yes, I do.
24     Q.  Are you claiming that that precludes you or
25 entitles you not to pay commissions that are due?

74

M.P. RADOCY, INC.        (650) 325-4393

1    A.    No.  Absolutely not.  One has nothing to do
2  with the other.  I believe we owe him the money for the
3  commissions.  And given time, we will pay it.
4         MR. RICE:  Okay.  I'd like to introduce the
5  UCC-1 as -- we marked my brief as 2, so that would be
6  "U."  I'm introducing it for the truth of the matter
7  asserted as an operative document.
8         THE ARBITRATOR:  Any objection?
9         MR. GREEN:  One moment.
10         No objection.
11         THE ARBITRATOR:  It's admitted.
12              (Whereupon, Claimant's Exhibit U was
13              marked for identification and received
14              into evidence.)
15         MR. RICE:  I have no further questions for
16  Mr. Goldenberg.
17         THE ARBITRATOR:  Can I ask a question?
18         I'm unclear what your role was.  You're a
19  consultant and CFO.  Is that correct?
20         THE WITNESS:  That's correct.
21         THE ARBITRATOR:  Sounds to me like you're
22  running the show.  What were you doing?
23         THE WITNESS:  I was the most senior person on
24  premise.  The company has a CEO and a president.  The CEO
25  spends some time on technical matters because she's an

1  engineer. But basically on day-to-day business matters,
2  I'm the person that they look to.
3          THE ARBITRATOR: That's helpful to me. Thank
4  you.
5          I thought we'd go to 1:00 and maybe break for
6  lunch.
7          DIRECT EXAMINATION BY MR. GREEN:
8          MR. GREEN: Q. In your opinion,
9  Mr. Goldenberg, was Mr. Gottlieb terminated?
10     A.  No.
11     Q.  Why do you say that?
12     A.  Because Mr. Gottlieb came to me and said he'd
13  like to move on.
14     Q.  Was he more specific?
15     A.  No.
16     Q.  Was he, in your opinion, constructively
17  terminated?
18     A.  No.
19     Q.  Were his job duties taken away?
20     A.  No.
21     Q.  Was he able to still perform his duties even
22  though a number of subordinates were either terminated or
23  resigned?
24     A.  Yes.
25     Q.  How was he able to do that without the support?

76

1    A.    The software that we had was, as I said earlier, shop worn and had to be renewed. And we undertook that renewal process, which Mr. Gottlieb and another person had suggested or told me would cost about $60,000 and take three months. $400,000 later and, I guess, a year later, year and a half later, we're still not there.

    And so we could not do some of the things economically that Mr. Gottlieb wanted to do like a press tour, because there was no reason to do it until the new software became available.

    Mr. Gottlieb was asked to continue selling as best he could given the quality of the product and to work with people on renewing maintenance contracts. In other words, continue his sales role and participate with the overall management at Nacio.

    He was invited and was part of every management meeting. He contributed not only to the Attest side but expressed opinions on the professional and on the systems side, which are our other two divisions.

    And aside from the fact that people were moved around and we changed the entire structure of the company, not just for Attest but also for the professional services group, he was asked to continue doing what he did best.

77

```
 1      Q.   Did he continue doing that?
 2      A.   I thought he did.
 3      Q.   Did he eventually leave the company?
 4      A.   Yes, he did.
 5      Q.   What was your understanding of the terms under
 6  which he left the company?
 7      A.   He left the company with the request that he be
 8  allowed to continue working for us as a consultant, which
 9  we appreciated and paid him for.  I always told Herb that
10  I liked him as an individual and thought highly of his
11  skills and wanted him to stay.
12           He chose to take a position with somebody that
13  I will call a competitor while he was still working for
14  us, which I disagreed with and told him I disagreed with.
15      Q.   Let's go back to the commission payment that
16  you said was owed but not payable.  Why is it not
17  payable, or when did it become payable?
18      A.   Well, it was my understanding at the time we
19  did the documents, and it never really became an issue
20  until Herb was ready to leave, that one month out of 12
21  doesn't constitute a month in which all the commissions
22  that have been accrued should be payable.
23           And so I felt that we should have an average of
24  three months, four months, something that would make
25  sense.  Not that he wouldn't earn the money.  He would
```

78

```
 1   continue to earn the money, but that we would only pay
 2   it -- because cash flow was very critical, and we would
 3   only pay the commissions when the cash is available.
 4        Q.   And is the cash available today?
 5        A.   No.
 6        Q:   Do you know when the cash will be available?
 7        A.   I'm meeting with some people this week. It's
 8   supposed to be tomorrow, and I'm hoping that we're going
 9   to be able to put a financing in place for Nacio in its
10   own right as opposed to Nacio's waiting for Encompass to
11   fund it. And it was my intention to generate some funds
12   out of that funding for Mr. Gottlieb, but I can't commit
13   to it until I know what the amount is and until it's a
14   done deal.
15        Q.   Is it your intent that when the cash is
16   available that Mr. Gottlieb will be -- that when the
17   funds become available, then at that point then the
18   commissions do become payable and then Mr. Gottlieb will
19   be paid?
20        A.   I don't believe they become payable, because
21   the division has never achieved an average $60,000 even
22   for two months in a row. But in order to bring this to a
23   head and live up to our obligation, I want to pay him and
24   get him out of my hair.
25        Q.   So it's your position that because the $60,000
```

79